C. TONY PICCUTA (AZ SBN: 028444)
SCOTTSDALE INJURY LAWYERS, LLC
8700 E. Pinnacle Peak Road, Suite 204
Scottsdale, Arizona 85255
Telephone: (480) 900-7390
Facsimile: (480) 562-6060
tony@scottsdaleinjurylawyers.com

Attorney for Plaintiffs, Selene Ortiz as guardian of Brian Ortiz, an incompetent person; and Selene Ortiz, individually

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Selene Ortiz as guardian of Brian Ortiz, an incompetent person; and Selene Ortiz, individually,<br><br>Plaintiffs,<br><br>v.<br><br>Maricopa County, a public entity; Sheriff Paul Penzone; Sergeant T. Newman (A6031); Officer R. Dean (B1569); Officer Griego (B2584); Officer B. Kaiser (A5027); Officer Rice (B3878); Officer C. Samaniego (A9595); Officer Weaver (A9453); Medical Officer C. Collett (B2461); Medical Officer Dugalic (A9909); Registered Nurse Rosie (CH686); Correctional Health Technician Maria (CS583); Doctor Bevels (CH1565); and Does 1–10, inclusive,<br><br>Defendants[1]. | No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

---

[1] All Defendants, other than Maricopa County, are sued in their individual capacities.

Plaintiffs, Selene Ortiz as guardian of Brian Ortiz and Selene Ortiz in her individual capacity, allege as follows:

## **INTRODUCTION**

This action arises from the near-deadly attack of Mr. Ortiz by another inmate in the Maricopa County jail system. On May 26, 2020, under what was supposed to be the watchful eye of detention personnel, Mr. Ortiz was punched, kicked and stomped by another inmate almost 50 times. He was beaten with such violent force that he fell into a coma and did not regain consciousness for more than two months. During this time, he required a ventilator to breathe and IV nutrition through feeding tubes. Specifically, he suffered a diffuse axonal shear injury at the corpus callosum. He will never be the same, much less a full-functioning adult. During the assault and in the critical time period following Mr. Ortiz's traumatic brain injury, no one came to his aid. In fact, Mr. Ortiz was not so much as placed in an ambulance until approximately 2 hours and 15 minutes after he was lying unconscious on the ground, seizing and bleeding from his head.

This shocking series of events was the result of the deliberate indifference to the safety and serious medical needs of Mr. Ortiz by Maricopa County, its Sheriff, and the jail's detention officers and medical staff. The acts and omissions complained of herein deprived Mr. Ortiz of his rights under the Eighth Amendment to the United States Constitution. They also deprived Mr. Ortiz and his mother, Selene Ortiz, of the companionship and society of each other in violation of the Fourteenth Amendment. Mr. Ortiz has been declared incompetent due to the injuries suffered in the subject-attack. As a result, his mother and guardian, Selene Ortiz, brings this action in her representative and individual capacities.

## **JURISDICTION AND VENUE**

1. This action arises under 42 U.S.C. § 1983, conferring jurisdiction upon this Court under 28 U.S.C. §§ 1331 and 1343.

///

///

2. Venue is proper in the District of Arizona because a substantial part of the events or omissions giving rise to the claims occurred in Maricopa County, which is within the judicial district. 28 U.S.C. § 1391(b).

**PARTIES**

3. Plaintiff Selene Ortiz ("Ms. Ortiz"), in her representative capacity, is the guardian of Brian Ortiz ("Mr. Ortiz"), an incompetent person.

4. Plaintiff Selene Ortiz, in her individual capacity, is the biological mother of Mr. Ortiz. At all relevant times, she was a resident of Maricopa County, Arizona.

5. Defendant Maricopa County ("County") is a public entity duly organized and existing under the laws of the state of Arizona. It is the legal entity responsible for the Maricopa County Sheriff's Office ("MCSO"), which operates the Maricopa County jail system. The County is also responsible for providing medical care to the County's jail inmates.

6. Defendant Paul Penzone ("Penzone") is, and at all relevant times was, the Sheriff of Maricopa County. As Sheriff, Penzone is, and at all relevant times was, required to take charge of and keep the Maricopa County jail system and its prisoners.

7. Each of the following defendants is being sued in his or her individual capacity: Sergeant T. Newman (A6031); Officer R. Dean (B1569); Officer Griego (B2584); Officer B. Kaiser (A5027); Officer Rice (B3878); Officer C. Samaniego (A9595); Officer Weaver (A9453); Medical Officer C. Collett (B2461); Medical Officer Dugalic (A9909); Registered Nurse Rosie (CH686); Correctional Health Technician Maria (CS583); and Dr. Bevels (CH1565).

8. At all relevant times, the individual defendants identified in paragraphs 6 and 7, above, were acting under color of state law and within the scope of their employment as employees of Maricopa County.

9. Plaintiffs are ignorant of the true names and capacities of the Doe defendants. However, Plaintiffs are informed and believe that each Doe Defendant, at all relevant times, was employed by Maricopa County. Further, that at all times mentioned

herein, each Doe Defendant was acting under color of state law and in the scope of his or her employment. The reasons these names are not yet known or ascertainable are that initial disclosures have not yet been exchanged, and Plaintiffs have not yet had an opportunity to engage in other formal discovery. Upon ascertaining the true identifies of Does 1 through 10, Plaintiffs will amend the Complaint or seek leave to do so as required by law.

## STATEMENT OF FACTS

**A. Maricopa County Sheriff's Office Policies and Procedures[2]**

10. The Maricopa County jail system is comprised of multiple facilities, including the Fourth Avenue Jail located at 201 S. 4th Avenue, Phoenix, Arizona 85003.

11. The Fourth Avenue Jail houses the highest security inmates in the Maricopa County jail system. However, it is not considered a direct supervision housing unit.

12. Among the inmate housing categories within the jail system is what is known as Closed Custody Housing. According to MCSO Policy Number DI-1, this housing is for persons who present a serious risk to the life of staff or other inmates, to property or to the orderly operation of the jail.

13. Policy Number DI-1 also dictates that Closed Custody "inmates shall be housed in a maximum-security jail facility, may be denied contact with other inmates, and may be locked in their cells for up to 23 hours daily."

14. Regarding inmate supervision, Policy Number DH-6 requires 24-hour supervision of all inmates at each jail facility, and that supervision is the responsibility of detention personnel. Policy Number DH-6 does not detail the manner of the supervision other than in direct supervision housing units.

15. Policy Number DH-6 also requires detention officers assigned to each housing unit to undertake security walks over the course of their shifts to ensure the well-being and safety of each inmate.

---

[2] All policies referenced were effective on the date of the subject-assault.

16. Healthcare services are provided to inmates by Correctional Health Services ("CHS"), which is an administrative subdivision of Maricopa County.

17. Under Policy Number DQ-1, decisions regarding the level and urgency of inmate care are the responsibility of CHS staff. Decisions concerning the security of staff and inmates in providing healthcare services are the responsibility of the MCSO.

18. Policy Number DQ-1 also proscribes procedures for emergency medical treatment. These include that CHS staff members are responsible for directing the particular level of care. However, an MCSO supervisor may request an ambulance before notifying CHS if it is believed that an inmate is suffering from a life-threatening condition.

19. Policy Number DQ-1 further outlines procedures for MCSO detention personnel in regard to emergency medical treatment. These include that MCSO detention personnel may request emergency treatment for an inmate if it is believed to be warranted. Also, detention personnel shall immediately contact CHS staff if he or she believes there is a medical emergency.

20. In addition, Policy Number DQ-1 requires a nurse to request an ambulance if life-sustaining equipment is needed.

21. Policy Number GJ-11 establishes procedures applicable to incidents involving illness, serious injury or death of an inmate.

22. Pursuant to Policy Number GJ-11, a detention officer must immediately seek or request medical attention for an inmate who is seriously injured or unconscious. Also, the shift supervisor must be notified of the incident.

23. Further, Policy Number GJ-11 requires detention officers to promptly administer needed emergency medical care, including CPR or first aid. And if there is a life-threatening emergency, a detention officer must call the fire department for emergency medical personnel.

///

///

Complaint
5

## B. The Attack of Brian Ortiz Under the Supervision of Detention Personnel

24. On May 26, 2020, Brian Ortiz was an inmate at the Fourth Avenue Jail. Mr. Ortiz was in Closed Custody housing and was assigned to cell 1.03, which was located in housing unit 4A, 100 pod (the "Pod").

25. Three other inmates housed in the Pod on May 26, 2020, were Xavier Fregoso ("Fregoso"), Jorge Amaya ("Amaya") and Percy Murphy ("Murphy"). Fregoso was assigned to cell 1.06, Amaya to cell 1.07 and Murphy to cell 1.05.

26. That morning, Fregoso approached the cell of Amaya. The two inmates had a conversation, and Amaya passed certain items under his cell door to Fregoso.

27. Shortly after, at approximately 7:40 a.m., Mr. Ortiz, Fregoso and Murphy were on dayroom access. At that time, Mr. Ortiz and Murphy were walking by the cell of Fregoso. Fregoso, who was near the back of his assigned cell, started a conversation with Mr. Ortiz. Fregoso then directed Mr. Ortiz's attention to something on the table inside Fregoso's cell.

28. At approximately 7:41 a.m., Mr. Ortiz entered the cell of Fregoso.

29. In the cell, Fregoso delivered closed fist strikes to the groin and face of Mr. Ortiz, knocking him against the wall before he fell to the ground. Fregoso then repeatedly stomped on Mr. Ortiz's head and face before again punching him. Approximately 16 punches and 32 foots-stomps were doled out during the beating.

30. At approximately 7:42 a.m., Fregoso exited his cell alone. He then approached Amaya and began laughing and appeared to be bragging about what had occurred. Fregoso then spoke with Murphy who exited his assigned cell and looked into Fregoso's cell. Murphy joined Fregoso in laughing at Mr. Ortiz who was still unconscious on the floor in Fregoso's cell.

31. At approximately 7:43 a.m., Fregoso returned to his cell and observed Mr. Ortiz still lying on the ground unconscious.

///

32. At approximately 7:44 a.m., Fregoso exited his cell, retrieved cleaning solution and walked back to his cell. Along the way, he was laughing and appeared to be bragging to Amaya and Murphy.

33. At approximately 7:45 a.m., Fregoso entered his assigned cell. Fregoso used his foot to nudge Mr. Ortiz, who remained unconscious on the floor of the cell. Fregoso then exited his cell and again spoke with Amaya.

34. At approximately 7:49 a.m., Fregoso entered his assigned cell and attempted to lift Mr. Ortiz and get him to stand under his own power. However, Mr. Ortiz was still unconscious and unable to stand, and so Fregoso laid him back down on the cell floor.

35. At approximately 7:50 a.m., Ortiz was seizing.

36. At approximately 7:52 a.m., Fregoso dragged Mr. Ortiz to Mr. Ortiz's assigned cell and placed him on his mattress.

37. At approximately 7:57 a.m., Fregoso poured cleaning solution from the back of his assigned cell toward the doorway. He also used a towel to clean Mr. Ortiz's blood from the cell. He then went to the shower and rinsed the towel.

38. During the 15–20-minute period following the attack of Mr. Ortiz, Fregoso stopped to speak with Amaya 13 times.

39. The above events were all recorded by the jail's video surveillance system.

40. At approximately 8:00 a.m., Defendant Officers Kaiser and Samaniego conducted a security walk in the Pod. During the security walk, they saw that Mr. Ortiz was in his cell unconscious. Kaiser and Samaniego took no additional action.

41. At approximately 8:50 a.m., Defendants Kaiser and Samaniego began another security walk in the Pod. On this subsequent walk, Defendant Kaiser stopped and spoke with Inmates Fregoso and Amaya.

42. Defendants Kaiser and Samaniego then continued their security walk. They again passed by an unconscious Mr. Ortiz without any further action.

///

43. Later that morning, at about 9:15 a.m., Defendants Collett, Dugalic, Rose and Maria were conducting medical rounds in the Pod.

44. During their rounds, they stopped at Mr. Ortiz's cell for a potential blood pressure assessment. When they did so, Defendant Collett looked into the cell and saw that Mr. Ortiz was non-responsive and was seizing.

45. Upon viewing Mr. Ortiz, Defendant Collett did not promptly administer medical care, nor did she request an ambulance. Instead, Collett asked Defendants Rosie and Maria to look at Mr. Ortiz and to give their opinions as to whether they also believed Mr. Ortiz was seizing.

46. Defendant Collett then radioed in a "man down" to security control and requested additional officers and staff.

47. At approximately 9:17 a.m., Defendants Newman, Griego, Kaiser, Rice, Samaniego and Weaver arrived at Mr. Ortiz's cell. A Code 4 was also called by Defendant Dugalic at this time.

48. The officers and medical staff at the scene saw that Mr. Ortiz was non-responsive and was seizing and that he had blood coming out of his ear. However, each one of the defendants failed to promptly administer emergency medical care, to call for emergency medical personnel or to call for an ambulance.

49. Before entering the cell, Defendant Newman ordered Defendant Rice to retrieve a shield from the level 4 control office.

50. Defendants then secured Mr. Ortiz with restraints around his hands, a belly belt and leg chains, before placing him on a backboard. During this time Mr. Ortiz was unconscious, non-responsive, had swelling to his face and was bleeding from his head. During this process, each defendant failed to administer emergency medical care or to summon emergency medical personnel or an ambulance.

51. At 9:25 a.m., approximately 1 hour and 45 minutes after he was nearly beaten to death, Mr. Ortiz was taken out of his cell on a backboard, placed on a gurney and taken to the facility's level 4 medical clinic.

52. At the medical clinic, Mr. Ortiz was examined by Defendant Bevels.

53. Dr. Bevels authorized an ambulance transport to Banner – University Medical Center Phoenix (formerly Good Samaritan Hospital) "to rule out head trauma."

54. At 9:55 a.m., half an hour after Mr. Ortiz was taken to the medical clinic—and 2 hours and 15 minutes after the attack—Mr. Ortiz was placed in an ambulance.

55. During the above-described events, Defendant Dean was assigned to the control tower. From the control tower, an officer can supervise inmates by way of the video surveillance system, which provides 100% coverage of the facility.

56. As a result of the attack, Mr. Ortiz suffered a severe traumatic brain injury and was comatose for more than two months. More specifically, his injuries included autonomic dysfunction, diffuse axonal brain injury, severe protein-calorie malnutrition, acute respiratory failure, coma, post-traumatic seizures, left hemiplegia, TBI (traumatic brain injury), traumatic subarachnoid hemorrhage with coma, dependence on respirator, diffuse traumatic brain injury with loss of consciousness greater than 24 hours without return to pre-existing conscious level, encephalopathy, hyperosmolality and hypernatremia, and pneumonia due to Klebsiella pneumoniae.

57. Ms. Ortiz was never told by the Maricopa County Sheriff's Office or any of its employees that her son had been attacked and had suffered serious injuries. Instead, on June 1, 2020, she was contacted by someone from the hospital who told her, for the first time, that her son was in critical condition and on life support.

58. On June 3, 2020, medical professionals at the hospital asked Ms. Ortiz for permission to take her son off life support and she refused.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs

### (By Selene Ortiz as Guardian of Brian Ortiz Against All Defendants)

59. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 58 as though fully set forth herein.

///

60. Defendants acted under color of state law while engaged in the conduct complained of herein. Their acts and failures to act deprived Mr. Ortiz of his rights under the Eighth Amendment to the United States Constitution.

**A. Defendants Newman, Dean, Griego, Kaiser, Rice, Samaniego, Weaver, Collett, Dugalic, Rosie, Maria and Bevels**

61. After the assault by Inmate Fregoso, Mr. Ortiz faced a serious medical need, including immediate emergency medical care and an ambulance, due to a serious traumatic brain injury.

62. Defendants Newman, Dean, Griego, Kaiser, Rice, Samaniego, Weaver, Collett, Dugalic, Rosie, Maria and Bevels were all deliberately indifferent to Mr. Ortiz's medical need. Each one of them knew that Mr. Ortiz was, or had been, seizing, unconscious and bleeding from his head. Every one of them failed to immediately and promptly administer emergency medical care, summon emergency medical personnel or call for an ambulance. These defendants knew of Mr. Ortiz's serious medical need and disregarded the need by failing to take reasonable steps to address it.

63. The failures to act of these defendants caused Mr. Ortiz to suffer the harm described herein, including a serious traumatic brain injury.

**B. Supervisory Defendant Penzone in His Individual Capacity**

64. The Maricopa County jail system has a history of providing inadequate medical care and of failing to address the serious medical needs of its inmates. This is documented to some extent in a class action lawsuit, *Graves v. Penzone*, that supports that these practices date as far back as 1977 and spanned more than 40 years.

65. Other high-profile lawsuits arose from the deaths of jail inmates, including Scott Norberg in 1996, Richard Post in 1996 and Brain Crenshaw in 2003. All of these cases involved deliberate indifference to the serious medical needs faced by the inmates prior to their deaths.

*///*

*///*

66. Maricopa County has paid millions of dollars in verdicts, settlements and legal fees to inmates, and their families and attorneys, for claims based on inadequate medical care.

67. By law, Penzone is responsible for operating the Maricopa County jails and for the care of the jail system's inmates. Penzone is also in charge of the development of MCSO policies.

68. In his position as Sheriff and given the history of inadequate medical care in the jail system, Penzone was aware that his subordinates were deliberately indifferent to the serious medical needs of the jail system's inmates.

69. Penzone failed to act to prevent his subordinates from engaging in such conduct.

70. Penzone also failed to ensure that MCSO personnel and CHS staff were adequately trained to respond to serious medical needs and to provide adequate medical care.

71. Penzone disregarded the known or obvious consequence that failing to adequately train his subordinates would cause his subordinates to violate Mr. Ortiz's constitutional rights.

72. Penzone's failure to act and the training deficiencies of his subordinates actually caused Penzone's subordinates to deprive Mr. Ortiz of his Eighth Amendment right to adequate medical care.

**C. Defendant Maricopa County Based on Acts of Final Policymaker and a Policy of Failure to Train**

73. Penzone had final policymaking authority from Maricopa County concerning all relevant policies applicable to the Maricopa County jails and their inmates, including training of MCSO detention personnel, development of new policies, inmate healthcare services, emergency procedures at the jail's facilities, and serious injury, illness or death of inmates.

///

Complaint
11

74. In his role as final policymaker, Penzone failed to ensure the jail system was staffed with competent medical personnel and detention officers who were adequately trained to respond to serious medical needs of inmates.

75. Further, the policies of Maricopa County were inadequate to train its employees to provide adequate medical care and to address the serious medical needs of the jail system's inmates.

76. Given the history of death and inadequate healthcare in the jail system, Maricopa County and its final policymaker, Penzone, were deliberately indifferent to the known or obvious consequences of the failure to implement adequate policies on training and of the failure to train medical staff and detention personnel. They knew of the substantial risk of serious harm and failed to take reasonable measures to address it, thereby making a conscious choice to disregard the consequences of their acts or omissions.

77. The acts of omission and failures of Maricopa County and its final policymaker, Penzone, to implement adequate policies on training and to provide adequate training caused the deprivation of Mr. Ortiz's Eighth Amendment rights by Defendants Newman, Dean, Griego, Kaiser, Rice, Samaniego, Weaver, Collett, Dugalic, Rosie, Maria and Bevels.

## **SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Failure to Protect**

**(By Selene Ortiz as Guardian of Brian Ortiz Against**

**Defendants Dean, Penzone and Maricopa County)**

78. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 77 as though fully set forth herein.

79. Defendants acted under color of state law while engaged in the conduct complained of herein. Their acts and failures to act deprived Mr. Ortiz of his rights under the Eighth Amendment to the United States Constitution.

*///*

### A. Defendant Dean

80. At all relevant times, Defendant Dean was assigned to the control tower. Dean was tasked with supervising the inmates by way of a video surveillance system, which provided 100% coverage of the jail facility.

81. Defendant Dean made an intentional decision with respect to the safety of Mr. Ortiz in that either he chose not to monitor the inmates, or he chose to disregard the attack on Mr. Ortiz.

82. Given the common occurrence of inmate on inmate assaults in the jail system, Defendant Dean's failures put Mr. Ortiz at a substantial risk of suffering serious harm. This was even more so given the Closed Custody housing category designation of the pod in which Mr. Ortiz was housed.

83. Defendant Dean did not take reasonable available measures to reduce the risk of harm to Mr. Ortiz, even though a reasonable detention officer under the circumstances would have appreciated the high degree of risk of failing to supervise the inmates or of failing to alert other detention personnel of the assault. As a result, the consequences of Dean's conduct were obvious.

84. By not taking reasonable available measures to abate the substantial risk of serious harm to Mr. Ortiz, both before, during and after the attack, Defendant Dean caused Mr. Ortiz's injuries.

### B. Supervisory Defendant Penzone in His Individual Capacity

85. The Maricopa County jail system has a history of inmate on inmate assaults, which have resulted in not only serious injuries, but also the deaths of numerous inmates. These include, but are not limited to, the deaths of Phillip Wilson in 2003, Wietse ten Boden in 2010, John Klatt in 2014 and Douglas Walker in 2014.

86. In 2017, the first year of Defendant Penzone's tenure as Maricopa County Sheriff, there were a reported 371 inmate on inmate assaults in the jail system.

///
///

87. In the present action, Mr. Ortiz was in Closed Custody housing at the time of the subject-attack. Closed Custody housing is reserved for some of the most dangerous inmates in the Maricopa County jail system.

88. By law, Penzone is responsible for operating the Maricopa County jails and for the care of the jail system's inmates. Penzone is also in charge of the development of MCSO policies.

89. In his position as Sheriff and given the history of inmate on inmate assaults, Penzone was aware that his subordinates had a history of deliberate indifference to inmate safety, including protection from violence at the hands of other inmates.

90. Penzone failed to act to prevent his subordinates from engaging in such conduct, including the failure to ensure that inmates were adequately supervised and that detention officers were conducting adequate security walks.

91. Penzone also failed to ensure that MCSO personnel were adequately trained to supervise, conduct security walks and otherwise protect inmates from assault by other inmates.

92. Penzone disregarded the known or obvious consequences that failing to adequately train his subordinates would cause his subordinates to violate Mr. Ortiz's constitutional rights.

93. These intentional acts of omission by Penzone put Mr. Ortiz at substantial risk of suffering serious harm, even more so because Mr. Ortiz was in Closed Custody housing with other dangerous inmates.

94. Though Penzone was aware of the substantial risk of serious harm to Mr. Ortiz, Penzone failed to take reasonable available steps to abate the risk and disregarded the obvious consequences of failing to adequately train his subordinates to supervise, conduct security walks and otherwise protect inmates from inmate on inmate assaults.

95. Penzone's failures actually caused Penzone's subordinates to deprive Mr. Ortiz of his Eighth Amendment right to protection from violence at the hands of other inmates.

### C. Defendant Maricopa County Based on Acts of Final Policymaker and a Policy of Failure to Train

96. Penzone had final policymaking authority from Maricopa County concerning all relevant policies applicable to the Maricopa County jails and their inmates, including training of MCSO detention personnel, development of new policies, inmate supervision, security walks and security surveillance systems.

97. In his role as final policymaker, Penzone failed to ensure the jail system was staffed with competent detention officers who were adequately trained to supervise, conduct security walks and otherwise protect inmates from inmate on inmate assaults.

98. Further, the policies of Maricopa County were not adequate to train its employees to supervise inmates, conduct security walks and otherwise protect inmates from violence at the hands of other inmates.

99. Given the history of inmate on inmate assaults in the jail system, Maricopa County and its final policymaker, Penzone, were deliberately indifferent to the known or obvious consequences of the failure to implement adequate policies on training and of the failure to train detention personnel.

100. Defendants were aware that their intentional acts of omission and failures put Mr. Ortiz at substantial risk of serious harm, yet they failed to take reasonable available steps to abate the risk.

101. The acts of omission and failures of Maricopa County and its final policymaker, Penzone, to implement adequate policies and provide adequate training caused the deprivation of Mr. Ortiz's Eighth Amendment right to protection from harm by other inmates.

### THIRD CLAIM FOR RELIEF

**42 U.S.C. § 1983 – Interference with Parent/Child Relationship**

**(By Selene Ortiz in Her Individual Capacity and as Guardian of Brian Ortiz Against All Defendants)**

102. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 101 as though fully set forth herein.

103. Defendants acted under color of state law while engaged in the conduct complained of herein. Their acts and failures to act deprived Plaintiffs of their rights under the Fourteenth Amendment to the United States Constitution.

104. As alleged above, the acts, failures to act, omissions and/or policies of each of the respective defendants amounted to deliberate indifference to Mr. Ortiz's serious medical needs and right to protection from violence at the hands of other inmates.

105. Defendants' deliberate indifference caused the deprivation of Plaintiffs' substantive due process rights under the Fourteenth Amendment to companionship and society of each other as mother and son.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. For judgment in favor of Plaintiffs and against Defendants;

B. For compensatory damages in an amount according to proof at trial;

C. For punitive damages in an amount sufficient to punish and deter;

D. For pre-judgment interest as allowed by law;

E. For costs and attorney's fees; and

F. For such other relief as the Court deems just and proper.

Dated: __9/8/2020__   **PICCUTA LAW GROUP, LLP**

/s/ *C.T. Piccuta*
Charles Tony Piccuta
Attorney for Plaintiffs, Selene Ortiz as guardian of Brian Ortiz, an incompetent person; and Selene Ortiz, individually

///

///

///

## JURY TRIAL DEMAND

Plaintiffs, pursuant to Fed. R. Civ. P. 38, demand a trial by jury on all issues so triable.

Dated: __9/8/2020___             **PICCUTA LAW GROUP, LLP**

/s/ _C.T. Piccuta_
Charles Tony Piccuta
Attorney for Plaintiffs, Selene Ortiz as guardian of Brian Ortiz, an incompetent person; and Selene Ortiz, individually